**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

Case No.:  _____

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY, and GEICO CASUALTY CO.,

                Plaintiffs,                    **Jury Trial Demand**

    -v-

A J THERAPY CENTER INC., RAMON JIMENEZ,
and JOSE LUIS CRUZ, M.D.,

                Defendants.

_____/

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO" or "Plaintiffs"), as and for their Complaint against Defendants A J Therapy Center Inc. ("AJ Therapy"), Ramon Jimenez ("Jimenez"), and Jose Luis Cruz, M.D. ("Cruz")(collectively, the "Defendants"), hereby allege as follows:

1.      This action seeks to recover more than $4,600,000.00 that the Defendants wrongfully obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through AJ Therapy relating to medically unnecessary, illusory, unlawful, and non-reimbursable health care services and goods, including putative initial examinations,

follow-up examinations, physical therapy, home medical equipment ("HME"), and related services and goods (collectively, the "Fraudulent Services") that purportedly were provided to Florida automobile accident victims who were eligible for coverage under GEICO PIP insurance policies ("insureds").

2.     Additionally, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent, and unlawful PIP claims that the Defendants submitted through AJ Therapy, because of the fraudulent and unlawful activities described herein.

3.     As set forth herein, the Defendants were never entitled to receive payment on the PIP insurance claims that they submitted to GEICO, because:

(i)      at all relevant times, the Defendants operated in pervasive violation of Florida law, including: (a) the licensing and operating requirements set forth in Florida's Health Care Clinic Act, Fla. Stat. §§ 400.990 et seq. (the "Clinic Act"); (b) Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"); and (c) Florida's Physical Therapy Practice Act, Fla. Stat. §§ 486.011-486.172 (the "Physical Therapy Act"), thereby rendering the Defendants ineligible to collect PIP insurance benefits in the first instance, and rendering the Defendants' PIP insurance charges noncompensable and unenforceable;

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services;

(iii)    in many cases, the Fraudulent Services were never legitimately provided in the first instance;

(iv)     the Defendants' billing for the Fraudulent Services misrepresented and exaggerated the nature, extent, and results of the Fraudulent Services, in

2

order to fraudulently and unlawfully inflate the charges submitted to
GEICO;

(v)     the Defendants unlawfully billed GEICO for "physical therapy" services
        that were provided by massage therapists and unlicensed/unsupervised
        individuals; and

(vi)    the Defendants' billing for the Fraudulent Services misrepresented the
        identities of the individuals who performed or directly supervised the
        Fraudulent Services, and the billing was submitted in violation of the
        requirements set forth in Florida's Motor Vehicle No-Fault Law, Fla.
        Stat. §§ 627.730-627.7405 (the "No-Fault Law").

4.      As such, the Defendants do not now have – and never had – any right to
be compensated for the Fraudulent Services that were billed through AJ Therapy to
GEICO.

5.      Each charge submitted by the Defendants through AJ Therapy since at
least 2019 has been fraudulent and unlawful for the reasons set forth herein. The chart
annexed hereto as Exhibit "1" sets forth a large and representative sample of the
fraudulent and unlawful claims that have been identified to-date that the Defendants
submitted to GEICO by mail through AJ Therapy.

6.      The Defendants' fraudulent and unlawful scheme began no later than
2020 and has continued uninterrupted since that time. As a result of the Defendants'
scheme, GEICO has incurred damages of more than $4,600,000.00.

## PARTIES

### I.   Plaintiffs

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity
Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively,

"GEICO" or "Plaintiffs") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and issue automobile insurance policies in Florida.

## II.   **Defendants**

8.   Defendant AJ Therapy is a Florida corporation with its principal place of business in Tampa, Florida, and is owned by Jimenez. AJ Therapy was incorporated in February 2013, falsely purported to operate properly licensed health care clinics in compliance with the licensing and operating requirements set forth in the Clinic Act, and was used as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

9.   Defendant Jimenez resides in and is a citizen of Florida. Jimenez is not licensed to practice any health care profession in Florida. Jimenez is the owner of AJ Therapy, and used AJ Therapy as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

10.   Defendant Cruz resides in and is a citizen of Florida. Cruz was licensed to practice medicine in Florida on or about May 26, 2005. Cruz falsely purported to perform or directly supervise many of the Fraudulent Services at AJ Therapy, falsely purported to serve as medical director at AJ Therapy's health care clinics, and used AJ Therapy as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

## JURISDICTION AND VENUE

11.   This Court has jurisdiction over the subject matter of this action pursuant

4

to 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and the action is between citizens of different states.

12.    This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations (RICO) Act).

13.    Additionally, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

14.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of the Defendants reside, and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

## I.    Overview of the Pertinent Laws Governing No-Fault Insurance Reimbursement

15.    Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is set forth in the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to insureds.

16.    Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an

insurance company using the required claim forms – including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form") – in order to receive payment for medically necessary services.

17.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for "medically necessary" services. At the same time, a health care services provider, including a clinic licensed under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

18.     Pursuant to the No-Fault Law, "medically necessary" means:

[A] medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

> (a)     In accordance with generally accepted standards of medical practice;
>
> (b)     Clinically appropriate in terms of type, frequency, extent, site, and duration; and
>
> (c)     Not primarily for the convenience of the patient, physician, or other health care provider.

19.     PIP reimbursement for health care services is normally limited to $2,500.00 per insured. However, if a physician, physician assistant, or advanced practice registered nurse determines that an injured person suffered from an "emergency medical condition", health care providers can be reimbursed up to $10,000.00 per insured for health care services. See Fla. Stat. § 627.736.

20.     Pursuant to the No-Fault Law, an "emergency medical condition" means "a medical condition manifesting itself by acute symptoms of sufficient severity,

which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) [s]erious jeopardy to patient health[;] (b) [s]erious impairment to bodily functions[; and/or] (c) [s]erious dysfunction of any bodily organ or part."

21.  In order for a health care service to be eligible for PIP reimbursement, it not only must be medically necessary, but also must be "lawfully" provided.

22.  Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

23.  Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

24.  By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

25.  Pursuant to the Clinic Act, and subject to certain limited exceptions that are not applicable in this case, a license issued by the Florida Agency for Health Care

Administration (the "AHCA") is required in order to operate a clinic in Florida. The Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

26.     Pursuant to the Clinic Act, health care clinics operating in Florida without a valid exemption from the health care clinic licensing requirements must – among other things – appoint a physician as medical director who must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful", and take immediate corrective action upon discovery of a fraudulent or unlawful charge. Additionally, a clinic medical director must "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

27.     Pursuant to the Clinic Act, no health care clinic in Florida may operate without the day-to-day supervision of a legitimate physician-medical director.

28.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed . . . but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge" and is ineligible for payment. By extension, "[a] person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014."

29.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating

requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

30.     Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving – or failing to make a good-faith effort to collect – co-payments or deductibles from patients with PIP insurance.

31.     Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

32.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics operating pursuant to the Clinic Act, to collect PIP Benefits for massage therapy or for services performed by massage therapists, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting."

33.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit reimbursement for massage or for any other services rendered by massage therapists, regardless of any other kinds of health care licenses the massage therapists may have, and regardless of whether the massage therapists work under the supervision of other licensed health care practitioners.

34.     The No-Fault Law was amended to prohibit reimbursement for massage or for services performed by massage therapists in response to widespread PIP fraud

involving massage services and massage therapists.

35.    Pursuant to the Physical Therapy Act, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

36.    The Physical Therapy Act also prohibits unlicensed individuals from practicing physical therapy. While the Physical Therapy Act does provide an exception to this rule, which permits a physical therapist to delegate certain patient care activities to an unlicensed assistant, this exception only applies if the unlicensed assistant works under the direct supervision of a physical therapist.

37.    Health care practices in Florida may not collect PIP Benefits for: (i) massage; (ii) any services performed by massage therapists; or (iii) physical therapy services that are performed by unlicensed individuals without direct supervision by a licensed physical therapist. Thus, any such charges submitted by a health care provider are unlawful and noncompensable.

38.    Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)    for any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid by using a billing code that accurately describes the services performed;

(ii)    to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)    with respect to a bill or statement that does not substantially meet the

10

billing requirements as set forth in the No-Fault Law.

39.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare and Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes that are used to bill for health care services.

40.     In turn, the instructions promulgated by CMS for the completion of HCFA-1500 forms require, among other things, that all HCFA-1500 forms set forth – in Box 31 of the forms – the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

41.     Additionally, pursuant to the No-Fault Law, in order for a health care service to be eligible for PIP reimbursement, the applicable HCFA-1500 claim form must set forth the professional license number of the provider who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials."

42.     To "directly supervise" a service, a supervising health care practitioner must be present in the office suite and be immediately available to furnish assistance and direction throughout the performance of the procedure.

43.     Insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual health care practitioners who performed or directly supervised the underlying services.

11

## II.    The Defendants' Fraudulent and Unlawful Scheme

44.    Since at least 2019 and continuing through the present, the Defendants conceived and implemented a fraudulent scheme in which they billed GEICO millions of dollars for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable services.

45.    In the claims identified in Exhibit "1", almost none of the insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as the result of the relatively minor automobile accidents they experienced.

46.    Even so, in the claims identified in Exhibit "1", the Defendants purported to subject virtually every insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that the Defendants could submit to insurers – including GEICO – rather than to treat or otherwise benefit the insureds who purportedly received and were subjected to this "treatment".

47.    The Defendants provided their pre-determined and fraudulent treatment protocols to the insureds in the claims identified in Exhibit "1" without regard for the insureds' individual symptoms or presentation – or, in most cases, the total absence of any continuing medical problems arising from any actual automobile accidents.

48.    Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, thereby permitting the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each insured.

49.     No legitimate physician, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described herein to proceed under their auspices.

50.     The Defendants permitted the fraudulent treatment and billing protocols described herein to proceed under their auspices because: (i) AJ Therapy was, at all relevant times, operating in violation of the Clinic Act, without legitimate oversight and without a medical director who legitimately fulfilled their statutory duties as medical director; and (ii) the Defendants sought to profit from the fraudulent and unlawful billing that they submitted to GEICO and other insurers.

**A.     The Unlawful Operation of the AJ Therapy Clinics in Violation of the Clinic Act**

51.     As part of the Defendants' fraudulent and unlawful scheme, AJ Therapy operated health care clinics in pervasive violation of the Clinic Act and Florida law, including clinics located at 4710 Eisenhower Boulevard in Tampa, Florida; 4148 N. Armenia Avenue in Tampa, Florida; and 6295 Central Avenue North, in St. Petersburg, Florida (the "AJ Therapy Clinics").

52.     Because the AJ Therapy Clinics were health care clinics subject to the Clinic Act, Jimenez and AJ Therapy could not lawfully operate the AJ Therapy Clinics unless they employed a licensed physician or physicians as the medical directors of the AJ Therapy Clinics, who actually performed the required duties of clinic medical directors at the AJ Therapy Clinics.

53.     However, if Jimenez and AJ Therapy recruited legitimate physicians to

13

serve as the legitimate medical directors of the AJ Therapy Clinics, the physicians actually would be obligated to fulfill the statutory requirements applicable to clinic medical directors. By extension, any such legitimate medical directors would impede Jimenez from using AJ Therapy as a vehicle to submit large amounts of fraudulent and unlawful PIP billing to GEICO and other Florida automobile insurers.

54.     Accordingly, Jimenez and AJ Therapy required a physician or physicians willing to falsely pose as the "medical directors" at the AJ Therapy Clinics, but who – in actuality – would not fulfill and would not even attempt to fulfill the statutory requirements applicable to clinic medical directors, and thereby permit Jimenez to use AJ Therapy as a vehicle to submit a large amount of fraudulent and unlawful PIP billing to GEICO and other insurers.

55.     Therefore, Jimenez and AJ Therapy retained Cruz, a licensed physician, who – in exchange for compensation – was willing to falsely pose as the legitimate medical director of the AJ Therapy Clinics.

56.     In order to circumvent Florida law and induce the AHCA to maintain the licensure of the AJ Therapy Clinics, Jimenez and AJ Therapy entered into a secret agreement with Cruz.

57.     In exchange for compensation from Jimenez and AJ Therapy, Cruz agreed to falsely represent – to the AHCA; to the insureds who sought treatment at the AJ Therapy Clinics; and to the insurers, including GEICO, that received PIP claims from AJ Therapy – that he was the true medical director at the AJ Therapy Clinics, and that he truly fulfilled the statutory requirements applicable to clinic medical

14

directors at the AJ Therapy Clinics.

58.     However, Cruz never genuinely served as medical director at the AJ Therapy Clinics. Instead, from the beginning of Cruz's association with AJ Therapy as the purported "medical director" at the AJ Therapy Clinics, Cruz ceded true decision-making authority regarding health care services at the AJ Therapy Clinics – and the resulting billing – to Jimenez.

59.     Cruz never legitimately served as medical director at the AJ Therapy Clinics, inasmuch as he: (i) never conducted systematic reviews of the AJ Therapy Clinics' billings to ensure that the billings were not fraudulent or unlawful; (ii) never ensured that all treating practitioners at the AJ Therapy Clinics were properly licensed; and (iii) never even made any attempt to take corrective action with respect to the fraudulent and unlawful charges submitted through AJ Therapy, and instead permitted AJ Therapy and the AJ Therapy Clinics to operate in the fraudulent and unlawful manner set forth herein.

60.     What is more, though no Florida health care clinic may operate without the day-to-day supervision of a physician-medical director, Cruz never provided legitimate, day-to-day supervision at the AJ Therapy Clinics, and – in fact – Cruz was only occasionally present at AJ Therapy, if at all.

61.     For example, the AJ Therapy Clinics' AHCA clinic licensing application forms – which were submitted under the penalties of perjury – indicate that Cruz was only present at the AJ Therapy Clinics on an infrequent basis.

62.     Had Cruz legitimately served as the AJ Therapy Clinics' medical

director, he would have noted, among other things, that AJ Therapy and the AJ Therapy Clinics were – as set forth herein – operating in pervasive violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, the Physical Therapy Act, and the No-Fault Law.

63.    In fact, true authority over the provision of health care services at the AJ Therapy Clinics and the resulting billing submitted through AJ Therapy – including the authority that would, at legitimate clinics, be vested in the medical director – was held at all times by Jimenez.

64.    Cruz unlawfully permitted Jimenez to dictate the manner in which insureds would be treated at the AJ Therapy Clinics, and to dictate the manner in which health care services at the AJ Therapy Clinics would be billed to GEICO and other insurers, because he wanted to continue profiting through AJ Therapy's fraudulent and unlawful billing.

65.    Jimenez used the façade of Cruz's "appointment" as the purported "medical director" at the AJ Therapy Clinics to do what he was forbidden from doing – namely: (i) operate clinics without a legitimate medical director; (ii) engage in unlicensed medical decision-making with respect to the insureds who sought treatment at the AJ Therapy Clinics; and (iii) use AJ Therapy as a vehicle to submit large amounts of fraudulent and unlawful PIP billing to GEICO and other insurers.

**B.    The Fraudulent and Unlawful Claims for Initial Examinations at AJ Therapy**

66.    As an initial step in the Defendants' fraudulent treatment and billing protocols, the Defendants purported to provide virtually all of the insureds in the

claims identified in Exhibit "1" with an initial examination.

67.     Cruz purported to personally perform or directly supervise the substantial majority of the purported initial examinations in the claims identified in Exhibit "1".

68.     As set forth in Exhibit "1", the Defendants then billed the initial examinations to GEICO under CPT code 99203, typically resulting in a charge of $250.00, $275.00, or $350.00 for each initial examination they purported to provide.

69.     In the claims for initial examinations identified in Exhibit "1", the charges for initial examinations were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

70.     In fact, and as set forth herein, the Defendants were never eligible to collect PIP Benefits, inasmuch as AJ Therapy and the AJ Therapy Clinics operated in pervasive violation of Florida law.

71.     Moreover, and as set forth herein, the charges for initial examinations identified in Exhibit "1" were also fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

## 1.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems

72.     As set forth herein, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of CPT codes.

73.     The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

74.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the insured presented with problems of moderate severity.

75.    The CPT Assistant provides various clinical examples of moderate severity presenting problems that would support the use of CPT code 99203 to bill for an initial patient examination:

(i)    Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of a 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)    Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

76.    Accordingly, pursuant to the CPT Assistant, the moderate severity presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

77.    By contrast, to the extent that the insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their typically minor automobile accidents, the problems virtually always were minimal severity soft tissue

injuries such as sprains and strains.

78. For instance, and in keeping with the fact that the insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their typically minor automobile accidents, or else had problems of minimal severity, in the substantial majority of the claims identified in Exhibit "1", the insureds did not seek treatment at any hospital as the result of their accidents.

79. To the limited extent that the insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and were discharged with nothing more serious than a minor soft tissue injury diagnosis such as a sprain or strain.

80. Furthermore, in most of the claims identified in Exhibit "1", the contemporaneous police reports indicate that the insureds' vehicles were functional following the accidents, and that no one was seriously injured in their accidents – or injured at all.

81. Even so, in the claims for initial examinations identified in Exhibit "1", the Defendants routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the insureds presented with problems of moderate severity.

82. For example:

(i) On December 18, 2020, an insured named LA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LA's vehicle, that there was minor damage to the other vehicle, and that LA's vehicle was drivable following the accident. The police report further indicated that LA was not injured and

that LA did not complain of any pain at the scene. In keeping with the fact that LA was not seriously injured, LA did not visit any hospital emergency room following the accident. To the extent that LA experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of LA on December 23, 2020, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ii)    On February 19, 2021, an insured named AD was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AD's vehicle, that there was minor damage to the other vehicle, and that AD's vehicle was drivable following the accident. The police report further indicated that AD was not injured and that AD did not complain of any pain at the scene. In keeping with the fact that AD was not seriously injured, AD did not visit any hospital emergency room following the accident. To the extent that AD experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of AD on February 22, 2021, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iii)   On September 21, 2021, an insured named WR was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to WR's vehicle, that there was minor damage to the other vehicle, and that WR's vehicle was drivable following the accident. The police report further indicated that WR was not injured and that WR did not complain of any pain at the scene. In keeping with the fact that WR was not seriously injured, WR did not visit any hospital emergency room following the accident. To the extent that WR experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of WR on September 22, 2021, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iv)    On February 22, 2022, an insured named DH was involved in an automobile accident. The contemporaneous police report indicated that DH was not injured and that DH did not complain of any pain at the

scene. In keeping with the fact that DH was not seriously injured, DH did not visit any hospital emergency room following the accident. To the extent that DH experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of DH on March 2, 2022, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(v)     On July 27, 2022, an insured named JP was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JP's vehicle, that there was minor damage to the other vehicle, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and that JP did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of JP on July 27, 2022, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vi)    On October 31, 2022, an insured named DR was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to DR's vehicle, that there was minor damage to the other vehicle, and that DR's vehicle was drivable following the accident. The police report further indicated that DR was not injured and that DR did not complain of any pain at the scene. In keeping with the fact that DR was not seriously injured, DR did not visit any hospital emergency room following the accident. To the extent that DR experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of DR on November 1, 2022, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vii)   On November 7, 2023, an insured named BA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to BA's vehicle, that there was minor damage to the other vehicle, and that BA's vehicle was drivable following the accident. The police report further indicated that BA was not injured and

that BA did not complain of any pain at the scene. In keeping with the fact that BA was not seriously injured, BA did not visit any hospital emergency room following the accident. To the extent that BA experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of BA on November 9, 2023, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(viii)    On February 22, 2024, an insured named WG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to WG's vehicle, that there was minor damage to the other vehicle, and that WG's vehicle was drivable following the accident. The police report further indicated that WG was not injured and that WG did not complain of any pain at the scene. In keeping with the fact that WG was not seriously injured, WG did not visit any hospital emergency room following the accident. To the extent that WG experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of WG on February 26, 2024, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ix)    On March 4, 2025, an insured named AI was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AI's vehicle, that there was minor damage to the other vehicle, and that AI's vehicle was drivable following the accident. The police report further indicated that AI was not injured and that AI did not complain of any pain at the scene. In keeping with the fact that AI was not seriously injured, AI did not visit any hospital emergency room following the accident. To the extent that AI experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of AI on March 5, 2025, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(x)    On March 18, 2025, an insured named SG was involved in an automobile accident. The contemporaneous police report indicated that SG was not injured and that SG did not complain of any pain at the scene. In keeping with the fact that SG was not seriously injured, SG did not visit any

hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of SG on March 19, 2025, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

83.     These are only representative examples. In the claims identified in Exhibit "1", the Defendants virtually always falsely represented that the insureds presented with problems of moderate severity, when, in fact, the insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that the insureds had any presenting problems at all as the result of their typically minor automobile accidents.

84.     In the claims for initial examinations identified in Exhibit "1", the Defendants virtually always falsely represented that the insureds presented with problems of moderate severity in order to create a false basis for their charges for examinations billed under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

85.     In the claims for initial examinations identified in Exhibit "1", the Defendants virtually always falsely represented that the insureds presented with problems of moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the insureds, including medically unnecessary follow-up examinations, physical therapy, HME, and related services and goods.

**2.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

86.      What is more, in every claim identified in Exhibit "1" for initial examinations billed under CPT code 99203, the Defendants misrepresented and exaggerated the total amount of time that the examining practitioners – typically Cruz – spent performing the putative initial examinations.

87.      Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial examination represents that the physician or other practitioner who performed the examination spent at least 30 minutes of time performing the examination.

88.      When the Defendants billed for their purported initial examinations using CPT code 99203, they represented that the examining practitioners spent at least 30 minutes of time performing the examinations.

89.      In fact, in the claims for initial examinations identified in Exhibit "1", neither Cruz nor any other examining health care practitioner spent even 15 minutes of time performing the examinations – much less 30 minutes – to the extent that the examinations were actually conducted at all.

90.      In keeping with the fact that the initial examinations in the claims identified in Exhibit "1" did not involve more than 15 minutes of time performing the examinations, the examining practitioners used templated forms in purporting to conduct the examinations.

91.      All that was required to complete the templated forms was a brief patient interview and a perfunctory physical examination of the insureds, consisting of a check

of some of the insureds' vital signs and a limited check of the insureds' systems.

92.     These interviews and examinations did not require Cruz or any other examining health care practitioner to spend more than 15 minutes of time performing the putative initial examinations.

93.     In the claims for initial examinations identified in Exhibit "1", the Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations, because lengthier examinations that are billable under CPT code 99203 are reimbursable at higher rates than examinations that take less time to perform.

### 3.     Misrepresentations Regarding the Extent of Medical Decision-Making During the Initial Examinations

94.     Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination, namely straightforward, low complexity, moderate complexity, and high complexity medical decision-making.

95.     Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

96.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination.

97.     For an initial patient examination to legitimately entail "low complexity" medical decision-making, the examination typically must, among other things: (i) involve review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) there typically must be at least some real risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

98.     As set forth above and in Exhibit "1", the Defendants billed for virtually all of their putative initial patient examinations using CPT code 99203, and thereby falsely represented that the examining practitioners – typically Cruz – engaged in genuine low complexity medical decision-making in connection with the initial examinations.

99.     In fact, to the extent that the insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their typically minor automobile accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains.

100.     The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate low complexity medical decision-making.

26

101.   First, in the Defendants' claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

102.   When the insureds in the claims identified in Exhibit "1" presented to the Defendants for "treatment", they did not arrive with any significant medical records.

103.   Furthermore, prior to the initial examinations, the Defendants and their associates did not request any significant medical records from any other providers regarding the insureds, nor did they provide, review, or analyze any complex diagnostic tests or other information in connection with the examinations.

104.   Second, in the Defendants' claims for initial examinations identified in Exhibit "1", there was no risk of significant complications or morbidity – much less mortality – from the insureds' minor soft tissue complaints.

105.   Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants during the initial examinations.

106.   In virtually all of the claims identified in Exhibit "1", any diagnostic procedures and treatment options that the Defendants recommended or provided pursuant to the initial examinations were limited to a series of medically unnecessary follow-up examinations, physical therapy, HME, and related services and goods – none of which was health- or life-threatening if properly administered.

107.   Third, in the claims for initial examinations identified in Exhibit "1", the examining practitioners did not consider any significant number of diagnoses or

27

treatment options for insureds during the initial examinations.

108.    Rather, to the extent that the initial examinations were conducted in the first instance, the examining practitioners – at the direction of the Defendants – provided a substantially similar, pre-determined, and false series of soft tissue injury "diagnoses" for each insured, and prescribed a substantially similar course of medically unnecessary treatment for each insured.

109.    Specifically, in almost every instance in the claims identified in Exhibit "1", during the initial examinations, the insureds did not report any serious continuing medical problems that legitimately could be traced to an underlying automobile accident.

110.    Even so, the examining practitioners – at the direction of the Defendants – prepared initial examination reports in which they provided false, boilerplate sprain/strain and similar soft tissue "diagnoses" to virtually every insured.

111.    Then, based upon these artificial "diagnoses", the examining practitioners – at the direction of the Defendants – falsely diagnosed virtually every insured in the claims identified in Exhibit "1" with a purported "emergency medical condition" in order to increase the amount of PIP Benefits they could obtain for each insured, and then directed the insureds to receive a series of medically unnecessary follow-up examinations, physical therapy, HME, and related services and goods.

112.    Contrary to the Defendants' false diagnoses, the insureds in the claims identified in Exhibit "1" did not legitimately suffer from any "emergency medical conditions" – or any significant health care problems at all – as the result of their

typically minor automobile accidents.

113.    For example:

(i)    On June 19, 2021, an insured named JP was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JP's vehicle, that there was minor damage to the other vehicle, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and that JP did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On June 21, 2021, JP purportedly received an initial examination at AJ Therapy. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Defendants – provided JP with a false list of objectively unverifiable soft tissue injury "diagnoses", and then falsely diagnosed JP with a purported "emergency medical condition". Furthermore, neither JP's presenting problems nor the treatment plan provided to JP by the Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, JP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JP. Even so, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(ii)    On September 16, 2021, an insured named LS was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LS's vehicle, and that LS's vehicle was drivable following the accident. The police report further indicated that LS was not injured and that LS did not complain of any pain at the scene. In keeping with the fact that LS was not seriously injured, LS did not visit any hospital emergency room following the accident. To the extent that LS experienced any health problems at all as a result of the accident, they

were of minimal severity, and did not constitute any kind of "emergency medical condition". On September 21, 2021, LS purportedly received an initial examination at AJ Therapy. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Defendants – provided LS with a false list of objectively unverifiable soft tissue injury "diagnoses", and then falsely diagnosed LS with a purported "emergency medical condition". Furthermore, neither LS's presenting problems nor the treatment plan provided to LS by the Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, LS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LS. Even so, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(iii)    On December 6, 2021, an insured named AR was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AR's vehicle, that there was minor damage to the other vehicle, and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and that AR did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On December 8, 2021, AR purportedly received an initial examination at AJ Therapy. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Defendants – provided AR with a false list of objectively unverifiable soft tissue injury "diagnoses", and then falsely diagnosed AR with a purported "emergency medical condition". Furthermore, neither

AR's presenting problems nor the treatment plan provided to AR by the Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, AR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AR. Even so, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(iv)     On April 5, 2022, an insured named SR was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to SR's vehicle, that there was minor damage to the other vehicle, and that SR's vehicle was drivable following the accident. The police report further indicated that SR was not injured and that SR did not complain of any pain at the scene. In keeping with the fact that SR was not seriously injured, SR did not visit any hospital emergency room following the accident. To the extent that SR experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On April 6, 2022, SR purportedly received an initial examination at AJ Therapy. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Defendants – provided SR with a false list of objectively unverifiable soft tissue injury "diagnoses", and then falsely diagnosed SR with a purported "emergency medical condition". Furthermore, neither SR's presenting problems nor the treatment plan provided to SR by the Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, SR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to SR. Even so, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(v)      On May 10, 2022, an insured named SD was involved in an automobile accident. The contemporaneous police report indicated that there was

minor damage to SD's vehicle, that there was minor damage to the other vehicle, and that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured and that SD did not complain of any pain at the scene. In keeping with the fact that SD was not seriously injured, SD did not visit any hospital emergency room following the accident. To the extent that SD experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On May 13, 2022, SD purportedly received an initial examination at AJ Therapy. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Defendants – provided SD with a false list of objectively unverifiable soft tissue injury "diagnoses", and then falsely diagnosed SD with a purported "emergency medical condition". Furthermore, neither SD's presenting problems nor the treatment plan provided to SD by the Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, SD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to SD. Even so, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(vi)    On March 26, 2023, an insured named MG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MG's vehicle, that there was minor damage to the other vehicle, and that MG vehicle was drivable following the accident. The police report further indicated that MG was not injured and that MG did not complain of any pain at the scene. In keeping with the fact that MG was not seriously injured, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On March 29, 2023, MG purportedly received an initial examination at AJ Therapy. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records,

diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Defendants – provided MG with a false list of objectively unverifiable soft tissue injury "diagnoses", and then falsely diagnosed MG with a purported "emergency medical condition". Furthermore, neither MG's presenting problems nor the treatment plan provided to MG by the Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, MG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MG. Even so, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(vii)   On August 27, 2023, an insured named JN was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JN's vehicle, that there was minor damage to the other vehicle, and that JN vehicle was drivable following the accident. The police report further indicated that JN was not injured and that JN did not complain of any pain at the scene. In keeping with the fact that JN was not seriously injured, JN did not visit any hospital emergency room following the accident. To the extent that JN experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On August 28, 2023, JN purportedly received an initial examination at AJ Therapy. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Defendants – provided JN with a false list of objectively unverifiable soft tissue injury "diagnoses", and then falsely diagnosed JN with a purported "emergency medical condition". Furthermore, neither JN's presenting problems nor the treatment plan provided to JN by the Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, JN did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Defendants consisted of medically unnecessary physical therapy services,

which did not pose the least bit of risk to JN. Even so, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(viii)   On October 13, 2023, an insured named MH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MH's vehicle, that there was minor damage to the other vehicle, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and that MH did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On October 17, 2023, MH purportedly received an initial examination at AJ Therapy. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Defendants – provided MH with a false list of objectively unverifiable soft tissue injury "diagnoses", and then falsely diagnosed MH with a purported "emergency medical condition". Furthermore, neither MH's presenting problems nor the treatment plan provided to MH by the Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, MH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MH. Even so, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(ix)   On January 20, 2024, an insured named FB was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to FB's vehicle, that there was minor damage to the other vehicle, and that FB's vehicle was drivable following the accident. The police report further indicated that FB was not injured and that FB did not complain of any pain at the scene. In keeping with the fact that FB was not seriously injured, FB did not visit any hospital

emergency room following the accident. To the extent that FB experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On January 26, 2024, FB purportedly received an initial examination at AJ Therapy. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Defendants – provided FB with a false list of objectively unverifiable soft tissue injury "diagnoses", and then falsely diagnosed FB with a purported "emergency medical condition". Furthermore, neither FB's presenting problems nor the treatment plan provided to FB by the Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, FB did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to FB. Even so, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(x)     On May 23, 2024, an insured named AE was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AE's vehicle, that there was minor damage to the other vehicle, and that AE's vehicle was drivable following the accident. The police report further indicated that AE was not injured and that AE did not complain of any pain at the scene. In keeping with the fact that AE was not seriously injured, AE did not visit any hospital emergency room following the accident. To the extent that AE experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On May 28, 2024, AE purportedly received an initial examination at AJ Therapy. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Defendants – provided AE with a false list of objectively unverifiable soft tissue injury

"diagnoses", and then falsely diagnosed AE with a purported "emergency medical condition". Furthermore, neither AE's presenting problems nor the treatment plan provided to AE by the Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, AE did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AE. Even so, the Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

114. These are only representative examples. In the claims for initial examinations identified in Exhibit "1", the Defendants routinely and falsely represented that the examinations involved legitimate low complexity medical decision-making, when, in fact, they did not.

115. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

116. An individual's age, height, weight, general physical condition, location within the vehicle, and location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

117. As set forth above, in the claims identified in Exhibit "1", virtually all of the insureds whom the Defendants purported to treat were involved in relatively minor accidents.

118. It is improbable that any two or more insureds involved in any one of the typically minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

119.   It is even more improbable – to the point of impossibility – that this kind of pattern would recur with great frequency within the cohort of patients treating at the AJ Therapy Clinics, with numerous instances in which two or more patients who had been involved in the same accident supposedly presented with substantially similar symptoms warranting substantially similar diagnoses and treatment.

120.   Even so, in keeping with the fact that the Defendants' putative "diagnoses" were pre-determined and false, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, the examining practitioners at AJ Therapy – at the direction of the Defendants – frequently issued substantially similar, false "diagnoses", on or around the same date, to more than one insured involved in a single accident, and recommended a substantially similar course of medically unnecessary treatment to the insureds, despite the fact that each of the insureds was differently situated.

121.   For example:

(i)   On March 4, 2019, three insureds – RD, DF, and DD – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at AJ Therapy for initial examinations on the exact same date, March 5, 2019. RD, DF, and DD: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that RD, DF, and DD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided RD, DF, and DD with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(ii)   On January 21, 2020, three insureds – BG, JN, and MG – were involved in the same automobile accident. Thereafter – incredibly – all three

insureds presented at AJ Therapy for initial examinations on the exact same date, January 22, 2020. BG, JN, and MG: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that BG, JN, and MG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided BG, JN, and MG with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(iii)   On April 25, 2021, three insureds – EH, AE, and MN – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at AJ Therapy for initial examinations on the exact same date, April 26, 2021. EH, AE, and MN: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that EH, AE, and MN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided EH, AE, and MN with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(iv)   On February 23, 2022, three insureds – LB, EP, and YP – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at AJ Therapy for initial examinations on the exact same date, February 24, 2022. LB, EP, and YP: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that LB, EP, and YP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided LB, EP, and YP with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(v)   On April 17, 2022, three insureds – MA, YS, and YB – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at AJ Therapy for initial examinations on the exact same date, April 21, 2022. MA, YS, and YB: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the

vehicle. To the extent that MA, YS, and YB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided MA, YS, and YB with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(vi)    On November 7, 2022, three insureds – EM, MM, and ER – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at AJ Therapy for initial examinations on the exact same date, November 9, 2022. EM, MM, and ER: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that EM, MM, and ER suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided EM, MM, and ER with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(vii)    On October 18, 2023, three insureds – KM, AO, and MP – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at AJ Therapy for initial examinations on the exact same date, October 19, 2023. KM, AO, and MP: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that KM, AO, and MP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided KM, AO, and MP with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(viii)    On December 15, 2023, three insureds – AF, CF, and FF – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at AJ Therapy for initial examinations on the exact same date, December 19, 2023. AF, CF, and FF: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that AF, CF, and FF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided AF, CF, and FF with substantially similar, false soft tissue

injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(ix)    On February 3, 2024, three insureds – MV, DF, and RH – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at AJ Therapy for initial examinations on the exact same date, February 5, 2024. MV, DF, and RH: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that MV, DF, and RH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided MV, DF, and RH with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(x)    On April 14, 2024, three insureds – AC, NG, and BG – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at AJ Therapy for initial examinations on the exact same date, April 26, 2024. AC, NG, and BG: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that AC, NG, and BG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided AC, NG, and BG with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

122.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", the Defendants frequently issued substantially similar "diagnoses" – on or around the same date – to more than one insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the insureds, despite the fact that each of the insureds was differently situated and, in any case, did not require the treatment.

123.    The Defendants routinely caused these false "diagnoses" to be inserted

into their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the insureds.

124.    In the claims for initial examinations identified in Exhibit "1", the Defendants routinely and falsely represented that the putative initial examinations involved legitimate low complexity medical decision-making, in order to create a false basis to bill for the initial examinations under CPT code 99203. This is because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require any complex medical decision-making at all.

125.    In this context, Cruz, who – at all relevant times – purported to serve as medical director at AJ Therapy, did not legitimately perform the required duties of a clinic medical director at AJ Therapy.

126.    Had Cruz legitimately conducted systematic reviews of AJ Therapy's billings, he would have taken action – among other things – to address the fact that AJ Therapy's billings routinely and fraudulently misrepresented the nature, extent, and results of the purported initial examinations at AJ Therapy.

127.    In the claims for initial examinations identified in Exhibit "1", the Defendants routinely and fraudulently misrepresented that the initial examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, the initial examinations were neither lawfully provided nor reimbursable, because:

(i)    the putative initial examinations were illusory, with outcomes that were

pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the insureds' true individual circumstances and presentation;

(ii)    the charges for the putative initial examinations misrepresented the nature, extent, and results of the examinations; and

(iii)    AJ Therapy was never eligible to collect PIP Benefits in connection with the putative initial examinations in the first instance, inasmuch as AJ Therapy operated in pervasive violation of Florida law.

## C.    The Defendants' Fraudulent and Unlawful Claims for Follow-Up Examinations

128.    In addition to their fraudulent initial examinations, the Defendants also purported to subject many of the insureds in the claims identified in Exhibit "1" to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocols.

129.    Cruz purported to perform or directly supervise most of the follow-up examinations in the claims identified in Exhibit "1".

130.    As set forth in Exhibit "1", the Defendants then billed the follow-up examinations to GEICO under: (i) CPT code 99213, typically resulting in a charge of $160.00, $210.00, or $286.00 for each follow-up examination they purported to provide; and (ii) CPT code 99214, typically resulting in a charge of $236.00 or $286.00 for each follow-up examination they purported to provide.

131.    In the claims for follow-up examinations identified in Exhibit "1", the charges for follow-up examinations were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

132.    In fact, and as set forth herein, the Defendants were never eligible to

42

collect PIP Benefits, inasmuch as AJ Therapy operated in pervasive violation of Florida law.

133.   As set forth below, the charges for the follow-up examinations identified in Exhibit "1" were also fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

## 1.   Misrepresentations Regarding the Severity of the Insureds' Presenting Problems

134.   Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up patient examination represents that the insured presented with problems of low to moderate severity.

135.   The CPT Assistant provides various clinical examples of low to moderate severity presenting problems that would support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)   Follow-up visit with a 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)   Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)   Routine, follow-up office evaluation at three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)   Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

136.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

137.    Similarly, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up patient examination represents that the insured presented with problems of moderate to high severity.

138.    The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)    Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea, and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology / General Surgery / Internal Medicine / Family Medicine)

(viii)  Office visit with a 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

139.    Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

140.    By contrast, and as set forth herein, to the extent that the insureds in the claims identified in Exhibit "1" suffered any injuries at all as the result of their minor accidents, the injuries were minor soft tissue injuries – such as sprains and strains – which were not severe at all.

141.    Ordinary soft tissue injuries such as sprains and strains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and/or elevation – or no treatment at all.

142.    By the time the insureds in the claims identified in Exhibit "1" presented at AJ Therapy for the putative follow-up examinations, the insureds either did not have any genuine presenting problems at all as the result of their typically minor

45

automobile accidents, or their problems were minimal.

143. Even so, in the claims for follow-up examinations identified in Exhibit "1", the Defendants routinely billed GEICO for their putative follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the insureds continued to suffer from presenting problems of low to moderate severity or moderate to high severity at the time of the purported follow-up examinations.

144. For example:

(i) On January 6, 2020, an insured named BE was involved in an automobile accident. The contemporaneous police report indicated that BE's vehicle was drivable following the accident. The police report further indicated that BE was not injured and that BE did not complain of any pain at the scene. In keeping with the fact that BE was not seriously injured, BE did not visit any hospital emergency room following the accident. To the extent that BE experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following two purported follow-up examinations of BE at AJ Therapy on February 21, 2020, and March 20, 2020, the Defendants billed GEICO for the follow-up examinations under CPT codes 99214 and 99213, respectively, and thereby falsely represented that BE presented with problems of moderate to high severity and low to moderate severity, respectively.

(ii) On February 11, 2021, an insured named YT was involved in an automobile accident. The contemporaneous police report indicated that YT's vehicle was drivable following the accident. The police report further indicated that YT was not injured and that YT did not complain of any pain at the scene. In keeping with the fact that YT was not seriously injured, YT did not visit any hospital emergency room following the accident. To the extent that YT experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of YT at AJ Therapy on April 7, 2021, the Defendants billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that YT presented with problems of low to moderate severity.

(iii)    On August 10, 2021, an insured named MC was involved in an automobile accident. The contemporaneous police report indicated that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and that MC did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following two purported follow-up examinations of MC at AJ Therapy on September 2, 2021, and September 13, 2021, the Defendants billed GEICO for the follow-up examinations under CPT codes 99214 and 99213, respectively, and thereby falsely represented that MC presented with problems of moderate to high severity and low to moderate severity, respectively.

(iv)    On April 5, 2022, an insured named SR was involved in an automobile accident. The contemporaneous police report indicated that SR's vehicle was drivable following the accident. The police report further indicated that SR was not injured and that SR did not complain of any pain at the scene. In keeping with the fact that SR was not seriously injured, SR did not visit any hospital emergency room following the accident. To the extent that SR experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following two purported follow-up examinations of SR at AJ Therapy on May 2, 2022, and July 5, 2022, the Defendants billed GEICO for the follow-up examinations under CPT codes 99214 and 99213, respectively, and thereby falsely represented that SR presented with problems of moderate to high severity and low to moderate severity, respectively.

(v)    On May 27, 2022, an insured named VG was involved in an automobile accident. The contemporaneous police report indicated that VG was not injured and that VG did not complain of any pain at the scene. In keeping with the fact that VG was not seriously injured, VG did not visit any hospital emergency room following the accident. To the extent that VG experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following two purported follow-up examinations of VG at AJ Therapy on June 20, 2022, and July 19, 2022, the Defendants billed GEICO for the follow-up examinations under CPT codes 99214 and 99213, respectively, and thereby falsely represented that VG presented with problems of moderate to high

severity and low to moderate severity, respectively.

(vi)    On November 11, 2022, an insured named MB was involved in an automobile accident. The contemporaneous police report indicated that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and that MB did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of MB at AJ Therapy on December 6, 2022, the Defendants billed GEICO for the follow-up examination under CPT code 99214, and thereby falsely represented that MB presented with problems of moderate to high severity.

(vii)   On January 1, 2023, an insured named YB was involved in an automobile accident. The contemporaneous police report indicated that YB was not injured and that YB did not complain of any pain at the scene. In keeping with the fact that YB was not seriously injured, YB did not visit any hospital emergency room following the accident. To the extent that YB experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following two purported follow-up examinations of YB at AJ Therapy on January 31, 2023, and March 2, 2023, the Defendants billed GEICO for the follow-up examinations under CPT codes 99214 and 99213, respectively, and thereby falsely represented that YB presented with problems of moderate to high severity and low to moderate severity, respectively.

(viii)  On August 31, 2023, an insured named EV was involved in an automobile accident. The contemporaneous police report indicated that EV's vehicle was drivable following the accident. The police report further indicated that EV was not injured and that EV did not complain of any pain at the scene. In keeping with the fact that EV was not seriously injured, EV did not visit any hospital emergency room following the accident. To the extent that EV experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following two purported follow-up examinations of EV at AJ Therapy on October 11, 2023, and October 23, 2023, the Defendants billed GEICO for the follow-up examinations under CPT

codes 99214 and 99213, respectively, and thereby falsely represented that EV presented with problems of moderate to high severity and low to moderate severity, respectively.

(ix)   On January 20, 2024, an insured named FB was involved in an automobile accident. The contemporaneous police report indicated that FB's vehicle was drivable following the accident. The police report further indicated that FB was not injured and that FB did not complain of any pain at the scene. In keeping with the fact that FB was not seriously injured, FB did not visit any hospital emergency room following the accident. To the extent that FB experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following two purported follow-up examinations of FB at AJ Therapy on April 15, 2024, and April 23, 2024, the Defendants billed GEICO for the follow-up examinations under CPT code 99213, and thereby falsely represented that FB presented with problems of low to moderate severity.

(x)   On March 14, 2024, an insured named RR was involved in an automobile accident. The contemporaneous police report indicated that RR's vehicle was drivable following the accident. The police report further indicated that RR was not injured and that RR did not complain of any pain at the scene. In keeping with the fact that RR was not seriously injured, RR did not visit any hospital emergency room following the accident. To the extent that RR experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of RR at AJ Therapy on July 15, 2024, the Defendants billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that FB presented with problems of low to moderate severity.

145.   These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", the Defendants routinely and falsely represented that the insureds presented with problems of low to moderate severity or moderate to high severity, when, in fact, the insureds either did not have any genuine presenting problems at all as the result of their typically minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were

minimal.

146.   In the claims for follow-up examinations identified in Exhibit "1", the Defendants virtually always falsely represented that the insureds presented with problems of low to moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations billed under CPT codes 99213 and 99214, because examinations billed under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the insureds.

## 2.   Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations

147.   What is more, in the claims for follow-up examinations identified in Exhibit "1", neither Cruz nor any other health care practitioner associated with AJ Therapy ever took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

148.   Rather, following the purported follow-up examinations at AJ Therapy, the examining practitioners – at the direction of the Defendants – simply: (i) reiterated the false, boilerplate "diagnoses" from the insureds' initial examinations; and (ii) either: (a) referred the insureds for even more medically unnecessary Fraudulent Services, despite the fact that the insureds purportedly had already received extensive physical therapy and other Fraudulent Services that supposedly had not been successful in resolving their purported pain symptoms; or (b) discharged the insureds

from "treatment", to the extent that their PIP Benefits had been exhausted.

149. The putative "follow-up examinations" that the Defendants purported to provide the insureds in the claims identified in Exhibit "1" were, therefore, medically useless, and played no legitimate role in the treatment or care of the insureds. This is because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plans that were pre-determined for each insured from the moment they presented at the AJ Therapy Clinics' offices.

150. In the claims for follow-up examinations identified in Exhibit "1", the Defendants routinely and falsely misrepresented that the follow-up examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, the follow-up examinations were neither lawfully provided nor reimbursable, because:

(i)    the putative follow-up examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the insureds' true individual circumstances and presentation;

(ii)   the charges for the putative follow-up examinations misrepresented the nature, extent, and results of the examinations; and

(iii)  AJ Therapy was never eligible to collect PIP Benefits in connection with the putative follow-up examinations in the first instance, inasmuch as AJ Therapy operated in pervasive violation of Florida law.

**D.    The Defendants' Fraudulent and Unlawful Claims for "Physical Therapy" Services**

151. In addition to the fraudulent initial and follow-up examinations, the Defendants virtually always purported to subject the insureds in the claims identified in Exhibit "1" to months of medically unnecessary "physical therapy" treatments,

which the Defendants then fraudulently and unlawfully billed to GEICO.

152.    As set forth in Exhibit "1", the Defendants billed the "physical therapy"

services to GEICO under:

(i)     CPT code 97010, for purported hot/cold pack treatment, typically resulting in a charge of $10.00 for each modality they purported to provide.

(ii)    CPT code 97012, for purported mechanical traction, typically resulting in a charge of $35.00 for each modality they purported to provide.

(iii)   CPT code 97014, for purported electrical stimulation, typically resulting in a charge of $30.00 for each modality they purported to provide.

(iv)    CPT code 97016, for purported application of a vasopneumatic device to one or more areas of the body, typically resulting in a charge of $42.00 for each modality they purported to provide.

(v)     CPT code 97018, for purported application of a paraffin bath or wax modality, typically resulting in a charge of $24.00 for each modality they purported to provide.

(vi)    CPT code 97026, for purported infrared treatment, typically resulting in a charge of $40.00 for each modality they purported to provide.

(vii)   CPT code 97028, for purported application of ultraviolet light to one or more areas, typically resulting in a charge of $40.00 for each modality they purported to provide.

(viii)  CPT code 97032, for purported electrical stimulation, typically resulting in a charge of $42.00 for each modality they purported to provide.

(ix)    CPT code 97033, for purported iontophoresis to one or more areas, typically resulting in a charge of $45.00 for each modality they purported to provide.

(x)     CPT code 97034, for purported contrast bath therapy, typically resulting in a charge of $40.00 for each modality they purported to provide.

(xi)    CPT code 97035, for purported ultrasound treatment, typically resulting in a charge of $38.00 for each modality they purported to provide.

(xii)    CPT code 97036, for purported Hubbard tank hydrotherapy, typically resulting in a charge of $38.00 for each modality they purported to provide.

(xiii)   CPT code 97040, for purported manual therapy, typically resulting in a charge of $68.00 for each modality they purported to provide.

(xiv)   CPT code 97110, for purported therapeutic exercises, typically resulting in a charge of $71.00 for each modality they purported to provide.

(xv)    CPT code 97112, for purported therapeutic neuromuscular reeducation, typically resulting in a charge of $73.00 for each modality they purported to provide.

(xvi)   CPT code 97116, for purported therapeutic gait training with stairs, typically resulting in a charge of $62.00 for each modality they purported to provide.

(xvii)  CPT code 97122, for purported therapeutic manual traction, typically resulting in a charge of $73.00 for each modality they purported to provide.

(xviii) CPT code 97124, for purported therapeutic massage, typically resulting in a charge of $59.00 for each modality they purported to provide.

(xix)   CPT code 97140, for purported manual therapy, typically resulting in a charge of $65.00 for each modality they purported to provide.

(xx)    CPT code 97161, for purported low complexity physical therapy evaluations, typically resulting in a charge of $233.62 for each examination they purported to provide.

(xxi)   CPT code 97162, for purported moderate complexity physical therapy evaluations, typically resulting in a charge of $233.62 for each examination they purported to provide.

(xxii)  CPT code 97163, for purported high complexity physical therapy evaluations, typically resulting in a charge of $233.62 for each examination they purported to provide.

(xxiii) CPT code 97530, for purported therapeutic activities, typically resulting in a charge of $76.00 for each modality they purported to provide.

(xxiv) CPT code 97535, for purported self-care/home management training, typically resulting in a charge of $76.00 for each modality they purported to provide.

(xxv) HCPCS code G0283, for purported electrical stimulation, typically resulting in a charge of $30.00 for each modality they purported to provide.

(xxvi) HCPCS code S8948, for purported low-level laser therapy, typically resulting in a charge of $30.00 for each modality they purported to provide.

153.    In the claims identified in Exhibit "1", the charges for the purported "physical therapy" services were fraudulent and unlawful in that they misrepresented AJ Therapy's eligibility to collect PIP Benefits in the first instance.

154.    In fact, and as set forth herein, AJ Therapy was never eligible to collect PIP Benefits, inasmuch as AJ Therapy operated in pervasive violation of Florida law.

155.    In the claims identified in Exhibit "1", the charges for the purported "physical therapy" services also were fraudulent, unlawful, and ineligible for PIP reimbursement because the services were performed – to the extent that they were performed at all – by unlicensed/unsupervised individuals, and by massage therapists, including – among others – Isabel Conde de la Fuente, L.M.T. ("Conde de la Fuente"), Janet de la Cruz, L.M.T. ("Janet Cruz"), Tania Gonzalez Mendez, L.M.T. ("Gonzalez Mendez"), Gianina Guevara, L.M.T. ("Guevara"), Yoanna Pons, L.M.T. ("Pons"), Yuliannis Regalado, L.M.T. ("Regalado"), Midailys Rodriguez Morejon, L.M.T. ("Rodriguez Morejon"), Carmen L. Rodriguez Rome, L.M.T. ("Rodriguez Rome"), Marian Sanchez, L.M.T. ("Sanchez"), and Magalys Touset

Medina, L.M.T. ("Touset Medina"), none of whom was licensed to practice physical therapy.

156. The Defendants were aware of the fact that they could not legally recover PIP Benefits for services performed by massage therapists and unlicensed/unsupervised individuals.

157. As a result, and in order to conceal the fact that Conde de la Fuente, Janet Cruz, Gonzalez Mendez, Guevara, Pons, Regalado, Rodriguez Morejon, Rodriguez Rome, Sanchez, Touset Medina, and other massage therapists and unlicensed/unsupervised individuals performed the purported "physical therapy" services that were unlawfully billed through AJ Therapy, the Defendants omitted any reference to Conde de la Fuente, Janet Cruz, Gonzalez Mendez, Guevara, Pons, Regalado, Rodriguez Morejon, Rodriguez Rome, Sanchez, Touset Medina, and other massage therapists and unlicensed/unsupervised individuals associated with AJ Therapy on the HCFA-1500 forms that they used to bill for the putative "physical therapy" services.

158. Instead, in the claims for "physical therapy" services identified in Exhibit "1", the Defendants routinely and falsely listed Cruz in Box 31 of the HCFA-1500 forms as the supposed provider or direct supervisor of the purported "physical therapy" services.

159. In fact, Cruz – who was simultaneously purporting to perform or directly supervise an impossible number of physical therapy and other services on individual dates at three different AJ Therapy Clinic locations across Tampa and St. Petersburg,

Florida, as well as simultaneously purporting to run his own active medical practice, MD & Wellness Center, in Tampa, Florida – did not perform or directly supervise the "physical therapy" services in the claims identified in Exhibit "1", and could not have legitimately performed or directly supervised the "physical therapy" services.

160. For example:

(i) On January 2, 2020, Cruz purported to personally perform – or at least directly supervise – 23.75 hours of physical therapy and related services that were provided to 13 different GEICO insureds at three different AJ Therapy Clinic locations.

(ii) On March 11, 2020, Cruz purported to personally perform – or at least directly supervise – 41.5 hours of physical therapy and related services that were provided to 19 different GEICO insureds at three different AJ Therapy Clinic locations.

(iii) On October 14, 2020, Cruz purported to personally perform – or at least directly supervise – 28.25 hours of physical therapy and related services that were provided to 15 different GEICO insureds at two different AJ Therapy Clinic locations.

(iv) On June 22, 2021, Cruz purported to personally perform – or at least directly supervise – 25 hours of physical therapy and related services that were provided to thirteen different GEICO insureds at two different AJ Therapy Clinic locations.

(v) On November 9, 2021, Cruz purported to personally perform – or at least directly supervise – 28.75 hours of physical therapy and related services that were provided to 19 different GEICO insureds at three different AJ Therapy Clinic locations.

(vi) On April 6, 2022, Cruz purported to personally perform – or at least directly supervise – 28.5 hours of physical therapy and related services that were provided to 15 different GEICO insureds at two different AJ Therapy Clinic locations.

(vii) On October 24, 2022, Cruz purported to personally perform – or at least directly supervise – 28.75 hours of physical therapy and related services that were provided to 13 different GEICO insureds at two different AJ

Therapy Clinic locations.

(viii)   On January 23, 2023, Cruz purported to personally perform – or at least directly supervise – 34.75 hours of physical therapy and related services that were provided to 19 different GEICO insureds at two different AJ Therapy Clinic locations.

(ix)   On February 15, 2023, Cruz purported to personally perform – or at least directly supervise – 36.75 hours of physical therapy and related services that were provided to 20 different GEICO insureds at two different AJ Therapy Clinic locations.

(x)   On April 1, 2024, Cruz purported to personally perform – or at least directly supervise – 29.5 hours of physical therapy and related services that were provided to 17 different GEICO insureds at two different AJ Therapy Clinic locations.

(xi)   On September 23, 2024, Cruz purported to personally perform – or at least directly supervise – 24 hours of physical therapy and related services that were provided to 14 different GEICO insureds at three different AJ Therapy Clinic locations.

(xii)   On January 8, 2025, Cruz purported to personally perform – or at least directly supervise – 27.5 hours of physical therapy and related services that were provided to 13 different GEICO insureds at two different AJ Therapy Clinic locations.

(xiii)   On February 12, 2025, Cruz purported to personally perform – or at least directly supervise – 23.75 hours of physical therapy and related services that were provided to 15 different GEICO insureds at two different AJ Therapy Clinic locations.

(xiv)   On March 17, 2025, Cruz purported to personally perform – or at least directly supervise – 24.5 hours of physical therapy and related services that were provided to 14 different GEICO insureds at two different AJ Therapy Clinic locations.

(xv)   On May 6, 2025, Cruz purported to personally perform – or at least directly supervise – 23.75 hours of physical therapy and related services that were provided to 15 different GEICO insureds at two different AJ Therapy Clinic locations.

161.   These are only representative examples. In the claims identified in

Exhibit "1", the Defendants routinely and falsely represented that Cruz had performed – or at least directly supervised – an impossible amount of services on individual dates, and often at multiple locations on individual dates.

162.   Furthermore, upon information and belief, the fraudulent billing for physical therapy services that the Defendants submitted to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that the Defendants submitted – or caused to be submitted – to all of the automobile insurers in the Florida automobile insurance market.

163.   GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

164.   It is extremely improbable – to the point of impossibility – that the Defendants only submitted fraudulent billing to GEICO alone, and that the Defendants did not simultaneously bill other automobile insurers.

165.   Thus, upon information and belief, the impossible amount of Fraudulent Services that Cruz purported to perform or directly supervise for GEICO insureds, on individual dates of service – including but not limited to the dates of service identified above – constituted only a fraction of the total amount of Fraudulent Services that Cruz purported to perform or directly supervise on those same dates of service.

166.   Even so, the Defendants billed GEICO for tens of thousands of purported health care services, and falsely represented in the billing that Cruz had personally performed or directly supervised almost all of them.

167.   In the claims for "physical therapy" services identified in Exhibit "1", the

Defendants routinely and falsely misrepresented that the "physical therapy" services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

    (i)    the purported "physical therapy" services were performed – to the extent that they were performed at all – by massage therapists and unlicensed/unsupervised individuals, in contravention of Florida law;

    (ii)    the Defendants could not lawfully recover PIP Benefits for the purported "physical therapy" services, because they were performed by massage therapists and unlicensed/unsupervised individuals;

    (iii)    the Defendants systematically and fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative "physical therapy" services; and

    (iv)    AJ Therapy was not entitled to receive PIP insurance reimbursement in the first place, because it was operated in violation of Florida law.

168.    Moreover, and in keeping with the fact that the "physical therapy" services in the claims identified in Exhibit "1" were unlawfully performed by massage therapists and unlicensed/unsupervised individuals without any legitimate supervision by Cruz or any other physicians, or physical therapists, the services were medically unnecessary and were provided – to the extent that they were provided at all – in a manner that did not comply with legitimate standards of care.

169.    In a legitimate clinical setting, each individual patient's physical therapy treatment schedule, and the specific treatment modalities that will be used as a part of that treatment, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

170.    In a legitimate clinical setting, the nature of, extent of, and schedule for

physical therapy is regularly adjusted for each individual patient based on each patient's treatment progress, as assessed on an ongoing basis as they receive the physical therapy.

171.   In keeping with the fact that the purported "physical therapy" services that were billed through AJ Therapy to GEICO were not medically necessary, the Defendants did not tailor the "physical therapy" services that they purported to provide to each insured's individual circumstances and presentation.

172.   There are many individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

173.   However, the Defendants purported to provide substantially similar physical therapy "treatments" to the insureds in the claims identified in Exhibit "1" – on substantially the same schedule – without regard for the insureds' individual clinical needs.

174.   In this context, Cruz – who, at all relevant times, purported to be the medical director at the AJ Therapy Clinics – did not, and could not have, legitimately performed his duties as medical director of the AJ Therapy Clinics.

175.   Had Cruz actually performed his duties as medical director, he would have taken action to address the fact that – among other things – the "physical therapy" services at AJ Therapy were medically unnecessary, unlawfully provided by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

**E.**     **The Defendants' Fraudulent and Unlawful Claims for HME**

176.    As part of their fraudulent and unlawful schemes, the Defendants purported to provide many insureds with HME – and particularly, rigid lower back braces known as lumbar-sacral orthoses ("LSO") and knee orthoses.

177.    As set forth in Exhibit "1", the Defendants billed GEICO for the HME under:

(i)     HCPCS code L0450, for purported LSOs with trunk support, typically resulting in a charge of $2,620.02 for each unit they purported to provide.

(ii)    HCPCS code L0627, for purported LSOs with sagittal control, typically resulting in a charge of $791.18 for each unit they purported to provide.

(iii)   HCPCS code L0637, for purported LSOs with sagittal-coronal control, typically resulting in a charge of $2,620.02 for each unit they purported to provide.

(iv)    HCPCS code L1832, for purported knee orthosis, typically resulting in a charge of $1,450.98 for each unit they purported to provide.

178.    Like the Defendants' charges for the other Fraudulent Services, the charges for HME were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

179.    In fact, and as set forth herein, the Defendants were never eligible to collect PIP Benefits, inasmuch as AJ Therapy operated in pervasive violation of Florida law.

180.    Moreover, the Defendants' charges for the HME identified in Exhibit "1" were also fraudulent in that they misrepresented the medical necessity of the HME – and in particular, the medical necessity of rigid LSOs.

181.   A rigid LSO is a custom-fitted lower back brace designed to restrict the movement of a patient's torso and support the patient's lumbar spine. Because of its rigidity and required placement on a patient's lower back, a rigid LSO must be custom-fitted in order for it to be properly utilized by the patient.

182.   In a legitimate clinical setting, a rigid LSO is reserved for patients who exhibit spinal instability or for patients who have recently undergone spinal surgery.

183.   Because a rigid LSO is designed to limit the range of motion of a patient's lumbar spine, its prescription is inconsistent with the goals of treatment designed to restore and increase range of motion and functionality of the lumbar spine.

184.   Along similar lines, the prescription and use of a rigid LSO would be counterproductive to the goals of physical therapy treatment modalities, which seek to restore movement and functionality to the lumbar spine.

185.   In fact, the medically unnecessary prescription of a rigid LSO – and the resulting immobilization of the lumbar spine – may put a patient at considerable risk of weakening of the muscles or even atrophy of the muscles in the lower back.

186.   Moreover, in a legitimate clinical setting, a rigid LSO should not be prescribed to a patient before the patient has first attempted and failed a legitimate course of conservative treatment, and it should not simultaneously be prescribed with conservative treatment such as physical therapy.

187.   The insureds in the claims identified in Exhibit "1" did not suffer from spinal instability. In fact, virtually none of the insureds in the claims identified in Exhibit "1" suffered any significant injuries at all as the result of their minor accidents,

62

much less health problems requiring spinal surgery and subsequent immobilization of their spine.

188.   The insureds in the claims identified in Exhibit "1" typically had not attempted and failed a legitimate course of conservative treatment prior to their receipt of a prescription for a rigid LSO.

189.   Even so, the Defendants routinely purported to provide medically unnecessary HME, including rigid LSOs, to the insureds in the claims identified in Exhibit "1", despite the fact that:

(i)     the insureds did not suffer from spinal instability and were not recovering from spinal surgery;

(ii)    the Defendants did not measure or fit the devices for the insureds;

(iii)   the insureds had not yet failed any legitimate course of conservative treatment, and, in fact, were often prescribed the HME within days of their typically minor automobile accidents; and

(iv)    the insureds were often concomitantly prescribed a course of physical therapy at AJ Therapy, the supposed purpose of which was to restore the range of motion and functionality of – among other things – the insureds' lumbar spines, and the use of a rigid LSO would be counterproductive to this goal.

190.   For example:

(i)     On October 2, 2019, an insured named OR was involved in an automobile accident. On October 3, 2019, OR presented to AJ Therapy for an initial examination. OR was immediately prescribed a course of physical therapy, which OR underwent at AJ Therapy between October 4, 2019, and December 12, 2019. Nevertheless, OR was also prescribed medically unnecessary HME, despite the fact that OR: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at AJ

Therapy, the putative purpose of which was to increase, rather than decrease, OR's range of motion. The Defendants billed GEICO under HCPCS code L0637, seeking reimbursement of $2,620.02 for the medically unnecessary HME.

(ii)     On May 19, 2020, an insured named LP was involved in an automobile accident. On May 21, 2020, LP presented to AJ Therapy for an initial examination. LP was immediately prescribed a course of physical therapy, which LP underwent at AJ Therapy between May 22, 2020, and August 26, 2020. Nevertheless, LP was also prescribed medically unnecessary HME, despite the fact that LP: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at AJ Therapy, the putative purpose of which was to increase, rather than decrease, LP's range of motion. The Defendants billed GEICO under HCPCS code L0637, seeking reimbursement of $2,620.02 for the medically unnecessary HME.

(iii)    On August 18, 2020, an insured named AS was involved in an automobile accident. On August 20, 2020, AS presented to AJ Therapy for an initial examination. AS was immediately prescribed a course of physical therapy, which AS underwent at AJ Therapy between August 21, 2020, and November 4, 2020. Nevertheless, AS was also prescribed medically unnecessary HME, despite the fact that AS: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at AJ Therapy, the putative purpose of which was to increase, rather than decrease, AS's range of motion. The Defendants billed GEICO under HCPCS code L0637, seeking reimbursement of $2,620.02 for the medically unnecessary HME.

(iv)     On September 26, 2021, an insured named AA was involved in an automobile accident. On September 29, 2021, AA presented to AJ Therapy for an initial examination. AA was immediately prescribed a course of physical therapy, which AA underwent at AJ Therapy between September 30, 2021, and December 2, 2021. Nevertheless, AA was also prescribed medically unnecessary HME, despite the fact that AA: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet

failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at AJ Therapy, the putative purpose of which was to increase, rather than decrease, AA's range of motion. The Defendants billed GEICO under HCPCS code L0637, seeking reimbursement of $2,620.02 for the medically unnecessary HME.

(v)     On December 7, 2021, an insured named IL was involved in an automobile accident. On December 9, 2021, IL presented to AJ Therapy for an initial examination. IL was immediately prescribed a course of physical therapy, which IL underwent at AJ Therapy between December 13, 2021, and February 4, 2022. Nevertheless, IL was also prescribed medically unnecessary HME, despite the fact that IL: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at AJ Therapy, the putative purpose of which was to increase, rather than decrease, IL's range of motion. The Defendants billed GEICO under HCPCS code L0637, seeking reimbursement of $2,620.02 for the medically unnecessary HME.

(vi)    On August 17, 2022, an insured named DC was involved in an automobile accident. On August 18, 2022, DC presented to AJ Therapy for an initial examination. DC was immediately prescribed a course of physical therapy, which DC underwent at AJ Therapy between August 19, 2022, and October 6, 2022. Nevertheless, DC was also prescribed medically unnecessary HME, despite the fact that DC: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at AJ Therapy, the putative purpose of which was to increase, rather than decrease, DC's range of motion. The Defendants billed GEICO under HCPCS codes L0637 and L1832, seeking reimbursement of $2,620.02 and $1,450.98, respectively, for the medically unnecessary HME.

(vii)   On January 22, 2023, an insured named MM was involved in an automobile accident. On January 23, 2023, MM presented to AJ Therapy for an initial examination. MM was immediately prescribed a course of physical therapy, which MM underwent at AJ Therapy between January 24, 2023, and March 7, 2023. Nevertheless, MM was also prescribed medically unnecessary HME, despite the fact that MM: (a) did not suffer

from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at AJ Therapy, the putative purpose of which was to increase, rather than decrease, MM's range of motion. The Defendants billed GEICO under HCPCS codes L0637 and L1832, seeking reimbursement of $2,620.02 and $1,450.98, respectively, for the medically unnecessary HME.

(viii)   On June 12, 2023, an insured named LM was involved in an automobile accident. On June 14, 2023, LM presented to AJ Therapy for an initial examination. LM was immediately prescribed a course of physical therapy, which LM underwent at AJ Therapy between June 15, 2023, and July 28, 2023. Nevertheless, LM was also prescribed medically unnecessary HME, despite the fact that LM: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at AJ Therapy, the putative purpose of which was to increase, rather than decrease, LM's range of motion. The Defendants billed GEICO under HCPCS codes L0637 and L1832, seeking reimbursement of $2,620.02 and $1,450.98, respectively, for the medically unnecessary HME.

(ix)   On April 30, 2024, an insured named ZC was involved in an automobile accident. On May 2, 2024, ZC presented to AJ Therapy for an initial examination. ZC was immediately prescribed a course of physical therapy, which ZC underwent at AJ Therapy between May 3, 2024, and May 31, 2024. Nevertheless, ZC was also prescribed medically unnecessary HME, despite the fact that ZC: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at AJ Therapy, the putative purpose of which was to increase, rather than decrease, ZC's range of motion. The Defendants billed GEICO under HCPCS codes L0637 and L1832, seeking reimbursement of $2,620.02 and $1,450.98, respectively, for the medically unnecessary HME.

(x)   On September 18, 2024, an insured named DB was involved in an automobile accident. On September 19, 2024, DB presented to AJ Therapy for an initial examination. DB was immediately prescribed a course of physical therapy, which DB underwent at AJ Therapy between

September 20, 2024, and October 1, 2024. Nevertheless, DB was also prescribed medically unnecessary HME, despite the fact that DB: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at AJ Therapy, the putative purpose of which was to increase, rather than decrease, DB's range of motion. The Defendants billed GEICO under HCPCS code L0637, seeking reimbursement of $2,620.02 for the medically unnecessary HME.

191.   These are only representative examples. In virtually all of the claims for the HME identified in Exhibit "1", the Defendants falsely represented that the prescribed HME was medically necessary, when, in fact, it was not.

**F.     The Defendants' Violation of the False and Fraudulent Insurance Claims Statute**

192.   The Defendants knew that, if they made a legitimate, good-faith effort to collect deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful scheme described herein. For instance, if the Defendants made legitimate efforts to collect deductibles, insureds would be less likely to continue presenting to AJ Therapy on a regular basis for medically unnecessary treatment.

193.   Accordingly, and as part and parcel of their fraudulent and unlawful schemes, the Defendants unlawfully engaged in the general business practice of waiving – or failing to make a good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

194.   In keeping with this fact, in virtually all of the thousands of bills (i.e., HCFA-1500 forms) submitted to GEICO through AJ Therapy's Fraudulent Services, the Defendants represented that they did not collect any money, whether it be a co-

67

payment or a deductible, from the insureds.

195.    In the claims identified in Exhibit "1", the Defendants routinely and falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because the Defendants operated in violation of the False and Fraudulent Insurance Claims Statute.

## III.    The Fraudulent Claims the Defendants Submitted  to GEICO

196.    To support their fraudulent charges, the Defendants systematically submitted thousands of bills and treatment reports – containing thousands of individual charges – through AJ Therapy to GEICO, seeking payment for Fraudulent Services that the Defendants were not entitled to receive.

197.    The claims that the Defendants submitted to GEICO were false and misleading in the following material respects:

(i)    The bills and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with Florida law and were, therefore, eligible to collect PIP Benefits in the first instance, when, in fact, they were not.

(ii)    The bills and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided, lawfully billed to GEICO, and eligible for PIP reimbursement, when, in fact, they were not.

(iii)    The bills and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not performed at all, and – to the extent that they were performed – they were not medically necessary and were performed as part of pre-determined fraudulent treatment and billing

68

protocols designed solely to financially enrich the Defendants, and not to benefit the insureds who supposedly were subjected to the Fraudulent Services.

(iv)    The bills and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level and nature of the Fraudulent Services that purportedly were provided.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

198.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

199.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

200.   For instance, the Defendants knowingly misrepresented and concealed facts in an effort to prevent GEICO from discovering that the Defendants operated in violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

201.   The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently, never even performed in the first instance.

202.   The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were oftentimes unlawfully performed by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

203.    GEICO is under statutory and contractual duty to promptly and fairly process claims within thirty (30) days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to cause – and did cause – GEICO to rely on them. As a result, GEICO has incurred damages of more than $4,600,000.00.

204.    GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it commenced this action.

**FIRST CAUSE OF ACTION**
**Against AJ Therapy**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

205.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-204, above.

206.    There is an actual case in controversy between GEICO and AJ Therapy regarding more than $75,000.00 in fraudulent and unlawful pending billing that has been submitted to GEICO in the name of AJ Therapy.

207.    AJ Therapy has no right to receive payment for any pending bills submitted to GEICO because AJ Therapy unlawfully operated in violation of Florida law.

208.    AJ Therapy has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

209.   AJ Therapy has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services.

210.   AJ Therapy has no right to receive payment for any pending bills submitted to GEICO because – in many cases – the Fraudulent Services were never provided in the first instance.

211.   AJ Therapy has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

212.   Accordingly, GEICO requests that this Court enter a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that AJ Therapy has no right to receive payment for any of the pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Jimenez
### (Violation of RICO – 18 U.S.C. § 1962(c))

213.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-204, above.

214.   AJ Therapy is an ongoing "enterprise", as that term is defined in 18

U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

215.   Jimenez has knowingly conducted and/or participated in, directly or indirectly, the conduct of AJ Therapy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that AJ Therapy was not eligible to receive, because: (i) AJ Therapy unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

216.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

217.   AJ Therapy's business is racketeering activity, inasmuch as the enterprise

exists for the purpose of submitting fraudulent charges to insurance companies. The predicate acts of mail fraud are the regular way in which Jimenez operated AJ Therapy, inasmuch as AJ Therapy was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for AJ Therapy to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that AJ Therapy continues to attempt collection on the fraudulent billing submitted through AJ Therapy to the present day.

218.   AJ Therapy is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by AJ Therapy in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

219.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,600,000.00 pursuant to the fraudulent bills submitted through AJ Therapy.

220.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

### THIRD CAUSE OF ACTION
### Against Jimenez and Cruz
### (Violation of RICO – 18 U.S.C. § 1962(d))

221.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-204, above.

222.    AJ Therapy is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

223.    Jimenez and Cruz are employed by, or associated with, the AJ Therapy enterprise.

224.    Jimenez and Cruz knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of AJ Therapy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that AJ Therapy was not eligible to receive under the No-Fault Law, because: (i) AJ Therapy unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying

Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

225. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

226. Jimenez and Cruz knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

227. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,600,000.00 pursuant to the fraudulent bills submitted through the AJ Therapy enterprise.

228. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

### FOURTH CAUSE OF ACTION
**Against AJ Therapy, Jimenez, and Cruz**
**(Under Fla. Stat. §§ 501.201 et seq.)**

229. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-204, above.

230. AJ Therapy, Jimenez, and Cruz are actively engaged in trade and

commerce in the State of Florida.

231.    GEICO and its insureds are "consumers" as defined by Fla. Stat. § 501.23.

232.    AJ Therapy, Jimenez, and Cruz engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

233.    The bills and supporting documents submitted to GEICO by AJ Therapy, Jimenez, and Cruz in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) AJ Therapy's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

234.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of AJ Therapy, Jimenez, and Cruz has been materially injurious to GEICO and its insureds.

235.    The conduct of AJ Therapy, Jimenez, and Cruz was the actual and proximate cause of the damages sustained by GEICO.

236.    AJ Therapy, Jimenez, and Cruz's unfair and deceptive acts have caused GEICO to sustain damages of at least $4,600,000.00.

237.    By reason of AJ Therapy, Jimenez, and Cruz's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## FIFTH CAUSE OF ACTION
### Against AJ Therapy, Jimenez, and Cruz
### (Common Law Fraud)

238.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-204, above.

239.   AJ Therapy, Jimenez, and Cruz intentionally and knowingly made false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through AJ Therapy for the Fraudulent Services.

240.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that AJ Therapy was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

241.   AJ Therapy, Jimenez, and Cruz made the above-described false and fraudulent statements, and also concealed material facts, in a calculated effort to

induce GEICO to pay charges submitted through AJ Therapy that were not reimbursable.

242.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at least $4,600,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by AJ Therapy, Jimenez, and Cruz through AJ Therapy.

243.    AJ Therapy, Jimenez, and Cruz's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

244.    Accordingly, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### SIXTH CAUSE OF ACTION
**Against AJ Therapy, Jimenez, and Cruz**
**(Unjust Enrichment)**

245.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-204, above.

246.    As set forth above, AJ Therapy, Jimenez, and Cruz have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of GEICO.

247.    When GEICO paid the bills and charges submitted – or caused to be submitted – by AJ Therapy, Jimenez, and Cruz, it reasonably believed that it was legally obligated to make such payments based on AJ Therapy, Jimenez, and Cruz's

improper, unlawful, and unjust acts.

248.   AJ Therapy, Jimenez, and Cruz have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that AJ Therapy, Jimenez, and Cruz voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing scheme.

249.   AJ Therapy, Jimenez, and Cruz's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

250.   By reason of the above, AJ Therapy, Jimenez, and Cruz have been unjustly enriched in an amount to be determined at trial, but in no event less than $4,600,000.00.

## JURY DEMAND

251.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.   On the First Cause of Action against AJ Therapy, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that AJ Therapy has no right to receive payment for any pending bills submitted to GEICO.

B.   On the Second Cause of Action against Jimenez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $4,600,000.00, together with treble damages, costs, and reasonable attorneys' fees

pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

      C.    On the Third Cause of Action against Jimenez and Cruz, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $4,600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

      D.    On the Fourth Cause of Action against AJ Therapy, Jimenez, and Cruz, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $4,600,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

      E.    On the Fifth Cause of Action against AJ Therapy, Jimenez, and Cruz, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $4,600,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

      F.    On the Sixth Cause of Action against AJ Therapy, Jimenez, and Cruz, more than $4,600,000.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Dated: Jacksonville, Florida
      October 7, 2025

*/s/ Max Gershenoff*

Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen Wenger (FBN 92136)
RIVKIN RADLER LLP
1301 Riverplace Blvd., 10th Floor
Jacksonville, Florida 32207
Phone: (904) 792-8925
-and-
926 RXR Plaza
Uniondale, New York 11550
Phone: (516) 357-3000
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Lindsey.Trowell@rivkin.com
Kristen.Wenger@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO Insurance Company, and GEICO Casualty Co.*